UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN L. KONIK,

                        Plaintiff,               Civil Action No.: 13-cv-10326
                                               Honorable Victoria A. Roberts
              v.                   Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

Plaintiff Susan Konik[1] brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [10, 13] that have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [2].

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that the administrative law judge ("ALJ") did not err in the weight he gave to Konik's treating physician's opinion or in his credibility determination, and that his decision is supported by substantial evidence of record. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Konik's motion [10] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

---

[1] For unknown reasons, the docket incorrectly identifies the Plaintiff as Susan "Konick."

II.     **REPORT**

A.     **Procedural History**

On June 1, 2010, Konik filed an application for DIB, alleging disability as of January 1, 1999.  (Tr. 126-132).[2]  The claim was denied initially on October 22, 2010.  (Tr. 68-77).  Thereafter, Konik filed a timely request for an administrative hearing, which was held on October 13, 2011, before ALJ J. Thomas McGovern.  (Tr. 27-68).  Konik, represented by attorney Frank Partipilo, testified, as did vocational expert ("VE") Pauline McEachin.  (*Id.*).  On November 4, 2011, the ALJ found Konik not disabled.  (Tr. 10-26).  On December 20, 2012, the Appeals Council denied review.  (Tr. 1-6).  Konik filed for judicial review of the final decision on January 26, 2013.  [1].

B.     **Background**

1.     *Disability Reports*

In an undated disability report, Konik reported that the conditions preventing her from working are nerve damage in her lower groin, depression, and migraine headaches.  (Tr. 163).  She reported being treated by a primary physician and a pain clinic and taking Lyirca for her nerve damage and pain, and Xanax and Zoloft for her stress and depression.  (Tr. 166-67).  While she acknowledged working after her alleged onset date, she reported that she worked only a few days a week for her husband's business, and that she was able to miss days and lie down as needed in her work.  (Tr. 156-61; 168).

In a July 15, 2010 function report, Konik reported having chronic pain in her right lower groin that could come at any time and last anywhere from hours to short of a week.  (Tr. 169).  She needs to lie down to alleviate the pain.  (*Id.*).  She reported being able to do some

---

[2] Although the underlying file is not included in the record, it appears that Konik previously applied for and was denied benefits for part of this period, through November 2001.  (Tr. 70).  In addition, Konik's date last insured was December 31, 2003.  (Tr. 69).

paperwork, light housekeeping (such as dusting, laundry and dishes), and occasional cooking, as well as help to feed her cats. (Tr. 170-71). Her husband has to change the litter boxes, vacuum, sweep and perform the yard work. (*Id.*). Konik reported being unable to engage in her prior activities such as bowling, horseback riding, snowmobiling and going out with her friends. (Tr. 170). She also reported disrupted sleep due to pain. (*Id.*). She has not trouble with personal care. (*Id.*). She is able to drive and ride in a car, and also go out alone. (Tr. 172). She shops for food weekly and clothes every few months. (*Id.*).

Konik reported that the medication she takes negatively affects her memory and concentration, although she reported no problems with certain hobbies such as reading or doing puzzles. (Tr. 173). She reported eating dinner out, visiting and having friends over once or twice a month. (*Id.*). Konik stated that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, concentrate and complete tasks. (Tr. 174). She cannot lift more than 10 pounds, postural actions cause pain and she can only walk one block before needing to rest, sometimes for the remainder of the day. (*Id.*). In addition, she can only climb one flight of stairs, stand for one hour and sit for 1-2 hours. (*Id.*). She reported being able to finish what she starts, pay attention for 2-3 hours (if not in pain), and that she has no trouble following written instructions, but often has trouble with oral instructions. (*Id.*).

Konik's husband, Leo Konik filed a third-party function report on July 15, 2010. (Tr. 177-84). Mr. Konik's report mirrors Konik's self-report in most respects. He reported that Konik suffers from severe pain that prevents her from making plans, driving long distances, lifting or moving things, and that she is tired and weak and needs to lie down often and take days off. (Tr. 177). He also reported that she rarely drives or goes out by herself, and that while she can manage money, she often forgets bills and payments due to memory issues. (Tr. 180-81).

3

He reported that Konik does not handle stress well.  (Tr. 183).

In an undated appeals report, Konik reported the addition of Midrin to her medication regimen for treatment of her migraine headaches, as well as the subtraction of Lyrica.  (Tr. 197).  She reported no other changes in her condition.  (Tr. 195-99).

        2.    *Plaintiff's Testimony*

At the hearing, Konik testified that she works sporadically for her husband, somewhere between 2-3 hours a week.  (Tr. 34).  She testified that she makes approximately $375 a month before taxes, but when confronted by the ALJ with evidence that in 2007 she made $5,000 and in 2008 she made $6,000, Konik testified that her husband must have been more generous during this period of time.  (Tr. 36-37).  She testified that her time spent at work decreased between 2006 and the present due to chronic pain in her right groin area.  (Tr. 37-39).  The pain is constant, but ebbs and flows in severity, with the most severe pain confining her to bed.  (Tr. 39).  She rates her daily pain as a 4-5 on a ten-point scale, and a flare up causes her pain to reach a 10 in severity.  (Tr. 58-59).  A bout of severe pain could last anywhere between a few hours and a week.  (Tr. 40).  The origin of the pain is unknown, but could be due to scar tissue from previous surgeries.  (Tr. 41).  Konik testified that she had previously been on pain medication but stopped due to side effects and now takes no pain medication for her condition, and is instead "just liv[ing] with it."  (Tr. 39).  She now treats with a new doctor who has tried alternative forms of pain management, such as patches, but they have not provided relief.  (Tr. 40).

Konik testified that she cannot walk far, cannot climb, crawl, squat or bend, and cannot lift more than a gallon of milk.  (Tr. 41-42; 49).  She can stand for between fifteen and twenty minutes.  (Tr. 48).  She only experiences pain when sitting when her condition has "flared up."  (Tr. 49).  Konik testified she can fold laundry and clean the counters, but that her husband does

the laundry, dishes and feeds the cats and changes their litter.  (Tr. 48; 56).  She drives short distances to visit family and to shop.  (Tr. 51-53).  She testified she sometimes eats out with friends, and had ridden on the motorcycle once that year.  (Tr. 58).

Konik testified to experiencing migraine headaches lasting 10-12 hours and confining her to bed.  (Tr. 59-60).  Her pain makes it difficult for her to concentrate and focus.  (Tr. 60-61). She also testified to suffering from depression and stress due to her pain and inability to function like she used to, and that she takes Xanax and Zoloft for these conditions.  (Tr. 45-46).

### 3.    Medical Evidence

Because Konik's motion only takes issue with the ALJ's findings regarding her ilioinguinal pain, the record medical evidence will be discussed only as it relates to that condition.  Furthermore, because Konik's date last insured was December 31, 2003, medical evidence generated after that date will only be discussed to the extent it relates to her condition during the period at issue.[3]

### a.    Treating Sources

Konik began treating with Dr. H. Lee Bacheldor in 1989.  (Tr. 403).  In June 1998, Konik treated with Dr. Bacheldor for abdominal cramping and diarrhea that was believed to be

---

[3] To be eligible for disability insurance benefits, a person must become disabled during the period in which he or she has met the statutory special earnings requirements.  42 U.S.C. §§ 416(i)(2)(c); 423(a), (c), (d); 20 C.F.R. § 404.130.  "If a clamant is no longer insured for disability insurance benefits at the time she files her application, she is entitled to disability insurance benefits only if she was disabled before the date she was last insured."  *Renfro v. Barnhart*, 30 Fed. Appx. 431, 435 (6th Cir. 2002).  Therefore, the ALJ generally only considers evidence from the alleged disability onset date through the date last insured.  *King v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205-06 (6th Cir.1990).  "Evidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004).  Evidence of the plaintiff's condition after the date last insured is relevant to the disability decision only if the evidence "relate[s] back to the claimant's condition prior to the expiration of her date last insured."  *Wirth v. Comm'r of Soc. Sec.*, 87 Fed. Appx. 478, 480 (6th Cir. 2003).

secondary to irritable bowel syndrome.  (Tr. 247-48).  She had had a hysterectomy where her right ovary was left intact.  (Tr. 248; 218).  Upon exam, tenderness in her bilateral lower abdominal area was noted.  (Tr. 247).  She was prescribed Bentyl, with some effect, and scheduled for a colonoscopy, which was normal.  (Tr. 247-48; 243).  A pelvic ultrasound conducted in August 1998 and an abdominal x-ray taken in early September 1998 were both unremarkable.  (Tr. 217-18).

In September 1998, Konik returned to Dr. Bacheldor with continued complaints of severe right lower quadrant pain and loose stools after having been admitted to the emergency room by her gynecologist due to the same.  (Tr. 243).  An exam found "exquisite tenderness" in her right lower quadrant, but no obvious masses noted.  (*Id.*).  Dr. Bacheldor diagnosed Konik with chronic right lower quadrant pain "rule-out secondary to adhesions," and referred her to a surgeon for evaluation.  (*Id.*).

A surgical consultation with Dr. Evelyn Santiago found that Konik had had several laparoscopic surgeries in addition to her hysterectomy, including a splenectomy, removal of her appendix, repair of a hernia and treatment for adhesions.  (Tr. 425).  She was noted to have scar tissue prior to her hysterectomy.  (*Id.*).  Konik reported right lower quadrant pain, "sometimes mild, sometimes very severe."  (*Id.*).  Dr. Santiago diagnosed her with chronic pelvic pain probably secondary to residual ovarian syndrome and pelvic adhesions.  (Tr. 426).  She prescribed medication for ovarian suppression with later removal of the ovary possible and Darvocet for pain.  (Tr. 425-26).

At follow-up appointments with Dr. Santiago in December 1998 and January 1999, Konik reported no relief with Darvocet, or the alternatively prescribed Toradol.  (Tr. 422).  Dr. Santiago prescribed Ultram.  (*Id.*).  In March 1999, Konik reported that she was "doing better"

and wished to continue the ovarian suppression regimen.  (Tr. 421).  However, in September 1999, Konik returned to Dr. Santiago reporting continued right pelvic pain that she believed might not be related to her ovary but instead related to scar tissue.  (*Id.*).  She reported that her pain was so bad sometimes that she was unable to get up.  (*Id.*).  Despite her belief that her pain was not related to her ovary, Konik decided to proceed with laparoscopic removal of her right ovary, which took place in November 1999.  (Tr. 419-421; 429).

Konik returned to Dr. Bacheldor in May 2000 complaining of right lower quadrant pain that she believed was related to a urinary tract infection.  (Tr. 239).  She described the pain as stabbing and reported taking Tylenol.  (*Id.*).  An exam revealed tenderness and "slight guarding."  (*Id.*).  She was referred for an ultrasound and prescribed Toradol.  (Tr. 238).  An abdominal x-ray and CT scan taken in May 2000 were both normal.  (Tr. 318-19).  That same month, Konik reported right lower quadrant pain to Dr. Santiago, which began around the time she developed the urinary tract infection.  (Tr. 416).  She reported the pain as very localized, episodic and sharp, with some radiation to the lower pelvis.  (Tr. 417).  Upon exam, tenderness with no rebound was noted.  (*Id.*).  Dr. Santiago diagnosed right abdominal pain with uncertain etiology, but that it was not likely pelvic in nature.  (*Id.*).  She was referred to another surgeon for consultation and prescribed Lortab for pain.  (*Id.*).  A few days later she was prescribed Ultram, which she did not tolerate well.  (Tr. 418).  That surgeon referred Konik to the Pain Clinic at the University of Michigan after she received a negative colonic and bowel workup.  (Tr. 314).

At the initial pain clinic evaluation on August 3, 2000, Konik reported having had multiple abdominal and laparoscopic surgeries in the past.  (*Id.*).  She reported right lower quadrant pain for the last eight years that was sharp, stabbing, and localized with some radiation.  (*Id.*).  The pain was made worse by walking, stress and bowel movements.  (*Id.*).  She reported

difficulty sleeping, increased weight gain due to inactivity, depression and an inability to work for the last two years due to her pain. (*Id.*). Upon exam, severe pain was noted with a lumbar range of motion test, which caused Konik to require assistance getting back to the exam table. (Tr. 315). Her motor strength and reflexes were normal, but there was tenderness to palpation over her anterior-superior iliac spine, reproduced to passive flexion of her right thigh. (*Id.*). A straight leg raising test also reproduced the pain at 35 degrees. (*Id.*). She was diagnosed with chronic abdominal pain of unknown etiology, referred for a GI consult, and prescribed trazodone for sleep and Zoloft for depression. (*Id.*). A consultation with the gastroenterology department ruled out a bowel obstruction and Librax and Vioxx were prescribed. (Tr. 312-13).

Konik returned to the pain clinic in November 2000. (Tr. 309-311). She described her pain as intermittent in nature and that she could not predict a flare-up, but that it would often come with increased activity that involved twisting of the torso. (Tr. 309). She reported two to three severe attacks a week that "last for minutes up to several hours." (*Id.*). She reported that she has found nothing to relieve her pain. (*Id.*). An examination revealed tenderness to palpation and the doctor recommended and administered a right ilioinguinal nerve block, which initially reduced Konik's pain to a 1 on a 10-point scale. (Tr. 310). The success of that procedure led the doctor to believe the cause of the pain was at least partially either an ilioinguinal nerve injury or entrapment with scar tissue. (*Id.*).

At a January 12, 2001 follow-up appointment with the pain clinic, Konik reported that the nerve block had only provided her two hours of relief, followed by several days of increased pain. (Tr. 307). Her current level of pain on palpation was unchanged from her last visit. (*Id.*). The doctor prescribed Neurontin and Vioxx. (Tr. 307). At a follow-up on March 22, 2001, Konik reported pain that was an 8/10, but that she also had periods of up to two weeks where she

would be pain free.  She reported that her GI prescription of Librax was the most beneficial for her pain.  The doctor increased her Neurontin dosage and recommended follow-up.  (Tr. 305). At a May 3, 2001 follow-up, Konik reported no pain currently, but difficulty concentrating due to her increased Neurontin dosage.  (Tr. 303).  Her condition was unchanged with periods of pain followed by periods of relief.  (*Id.*).  The doctor maintained her current Neurontin dosage and recommended a follow-up.  (*Id.*).  A June 7, 2001 follow-up in the GI clinic was unremarkable. (Tr. 301).

Konik returned to the pain clinic on June 11, 2001, complaining of pain that rated 4/10. (Tr. 298-300).  She described the pain as constant, burning and sharp shooting in nature.  (Tr. 298).  She also complained of nervousness with a prior prescription of Ultram and difficulty concentrating with her current Neurontin dosage.  (*Id.*).  Diffuse tenderness was noted on her exam.  (*Id.*).  The doctor recommended an epidural steroid injection, to which Konik agreed. (Tr. 299).  He also decreased her Neurontin dosage and stopped her Ultram prescription.  (*Id.*). She received her first injection on June 28, 2001.  (Tr. 296).

At a follow-up on August 9, 2001, Konik reported that her pain had been "under reasonably good control" since her injection, rating it at a 4/10, but that she was concerned about increased bruising.  (Tr. 294).  The doctor managed her medications but halted further steroidal treatment in order for Konik to seek an evaluation of her bruising concerns.  (*Id.*).  At a follow-up appointment on October 11, 2001, Konik reported increased pain at a 7/10, but the doctor continued to refuse additional treatment pending a report regarding Konik's increased bruising. (Tr. 291-93).  Konik also reported that she was increasingly experiencing mental side effects from Neurontin.  (Tr. 291).  The doctor began weaning her from the medication.  (Tr. 292).  An exam found "significant discomfort" with palpation and the doctor prescribed a Lidoderm patch

for pain relief.  (*Id.*).

Konik returned to the pain clinic on November 15, 2001, after a finding by her primary physician that she did not have a bleeding disorder.  (Tr. 232; 288).  She had been completely weaned off Neurontin and was now on Gabitril.  (Tr. 288).  Her pain level was 7/10 and was worse since being off Neurontin.  (*Id.*).  She did not report any relief with the Lidoderm patch.  (*Id.*).  Upon exam, the doctor noted significant tenderness to palpation and recommended a second epidural injection, as Konik reported receiving three weeks of complete pain relief from the first injection.  (Tr. 288-89).  Konik similarly reported these same results of her first injection to Dr. Bacheldor at appointments on August 16, October 25, and October 30, 2001, characterizing the relief as "long-lasting."  (Tr. 229-32).  Konik underwent the second injection on December 13, 2001.  (Tr. 286-87).

At a follow-up on January 3, 2002, Konik reported no relief from her second injection, which was only half the dose of the first.  (Tr. 284).  Konik reported a current pain score of 10/10.  (*Id.*).  The doctor managed her medications and scheduled another injection at the original strength.  (Tr. 284-85).  The third injection was performed on January 16, 2002.  (Tr. 282-83).  At a February 14, 2002 follow-up, Konik reported good pain relief, with pain rating only 2/10 since the injection two weeks prior.  (Tr. 280).  Minimal discomfort was noted on palpation during examination.  (*Id.*).  The doctor managed Konik's medications.  (Tr. 280-81).  Konik continued to report relief at an appointment with the University of Michigan medical center on February 28, 2002.  (Tr. 278-79).  She reported pain only approximately twice a month, noting that "most of the rest of the time, she does fairly well."  (Tr. 278).

Konik returned to the pain clinic on May 16, 2002, complaining of an aggravation of symptoms after lifting a 40-pound bag of topsoil.  (Tr. 276).  She reported feeling some tearing

10

and then immediate pain that was similar to the pain she had previously experienced.  (*Id.*).  An exam revealed no immediate distress, but occasional twinges confirming inguinal pain that was reproducible on palpation.  (*Id.*).  Her medications were managed and another injection was scheduled.  (Tr. 277).  That injection was administered on July 17, 2002.  (Tr. 274-75).  At a follow-up on August 1, 2002, Konik reported that she was "very satisfied with the result" and her pain was a 0/10.  (Tr. 272).  Her only complaint was sleepiness due to one of her medications.  (*Id.*).  The doctor managed her medications.  (*Id.*).

At an October 24, 2002 appointment, Konik continued to report good relief, rating her pain at 2/10, and expressing a desire for additional injections.  (Tr. 270).  She reported that the prior injection had given her a few months of "total pain relief.  (*Id.*).  There was focal tenderness upon palpation during her exam.  (*Id.*).  The doctor managed her medications and scheduled another injection.  (*Id.*).  The injection was administered on November 18, 2002.  (Tr. 268-69).  Prior to the injection, Konik's pain score was 5/10, and it was 0/10 immediately after.  (Tr. 269).  At a March 7, 2003 follow-up, Konik continued to report pain at 0/10.  (Tr. 266).  An exam revealed decreased sensation over her right lower abdominal quarter and over the pubic bone.  (*Id.*).  The doctor recommended a follow-up in three months.  (*Id.*).

At a June 12, 2003 appointment, Konik reported pain of 3/10, but noted that she had received six months "of excellent pain control as a result of" her epidural injection.  (Tr. 264).  She requested another injection, which was administered on July 22, 2003.  (*Id.*; Tr. 262-63).  Her pain score immediately prior to the procedure was 8/10.  (Tr. 262).  Konik returned to the pain clinic on August 14, 2003, reporting no relief from the most recent injection.  (Tr. 260).  An exam revealed "tenderness to deep palpation along the right groin."  (*Id.*).  Her medications were managed and she was scheduled for another injection, which was administered on September 15,

2003.  (*Id.*; Tr. 258).  Immediately prior to the injection, Konik rated her pain as a 6-7/10.  (Tr. 258).

At a follow-up on September 25, 2003, Konik reported no pain generally, although she has episodes two to three times a week of stabbing pain that rates an 8/10.  (Tr. 255).  She reported these decreasing in frequency since her last injection, but not in intensity.  (*Id.*).  Upon exam, mild to moderate discomfort was noted on palpation, and moderate to severe pain on deep palpation.  (*Id.*).  She was prescribed Tylenol, her other medications were managed, and a follow-up was scheduled.  (Tr. 256).  At an appointment on November 6, 2003, Konik reported receiving no relief from the September injection, rating her baseline pain at 7/10.  (Tr. 253).  She reported no specific factors that precipitate her pain.  (*Id.*).  There was tenderness to palpation on examination and another injection was scheduled.  (*Id.*).  It is unclear whether Konik ever underwent that procedure, however, or what the results were, as the next time she presented to the pain clinic was on April 8, 2004.  (Tr. 320-23).  At that appointment she reported having received no relief from any injection except one, and that her current pain was a 5/10.  (Tr. 320).  She reported that her pain made it difficult to wear clothes or be intimate with her husband.  (*Id.*).  She did not wish for any additional intervention procedures, due to her belief they were of no benefit.  (*Id.*).  She was also concerned about the effects of her medications, and the financial constraints of her trips to the clinic.  (*Id.*).  Upon exam, pain was noted over the right ilioinguinal nerve distribution.  (Tr. 321).  The doctor reduced her medications and returned Konik to the care of her primary physician.  (Tr. 321-22).

At a May 28, 2004 appointment with Dr. Bacheldor, Konik reiterated her disappointment with the results of her treatment at the pain clinic, as well as the financial hardship it caused.  (Tr. 444).  She reported that she was recently trying to be more active, but that she experienced pain

12

with prolonged walking, simple gardening and housework.  (*Id.*).  She requested "something to take as needed for severe bouts of pain."  (*Id.*).  Dr. Bacheldor prescribed Vicodin, after noting tenderness upon palpation during examination.  (Tr. 443-44).  Konik reported that she would use it infrequently.  (Tr. 443).

The next treatment record for Dr. Bacheldor is almost two years later, on April 7, 2006.  (Tr. 443).  Notes from this appointment are partially obscured by a prescription sheet, but it appears Konik presented with a complaint of headaches.  (*Id.*).  She also reported continued inguinal pain for which she took Vicodin 2-3 times a week.  (*Id.*).  According to subsequent treatment notes, Konik continued this regimen with Vicodin through at least March 2010, when she was prescribed Lyrica at bedtime in addition.  (Tr. 364; *see also* 365-69; 433-435; 442; 445-46).  She presented again in May 2010 seeking to have forms completed for disability and a referral to pain management.  (Tr. 388).  Dr. Bacheldor completed her forms, but did not conduct an examination at this appointment.  (*Id.*).  Konik treated with Dr. Bacheldor on February 17, 2011, after being treated by pain management who, according to the notes, administered nerve blocks for her inguinal pain.  (Tr. 383).  She was also noted to be taking Lyrica at the time.  (*Id.*).

In an undated medical source statement, Dr. Bacheldor addressed Konik's condition for the period from 2002 to 2005.  (Tr. 403).  He noted that she had been a patient since 1989 and had suffered from right inguinal neuropathy and chronic inguinal pain since 1998.  (*Id.*).  He labeled her prognosis as poor.  (*Id.*).  He noted her pain was constantly at a 3-4 out of 10, and regularly 10/10, and was not relieved by interventions through intense pain management.  (*Id.*).  He found that her pain would frequently interfere with her ability to perform simple work tasks and that she was incapable of working at even "low stress" jobs.  (Tr. 404).  He stated that she could walk four blocks before needing to rest, sit more than two hours and stand for 20 minutes

before needing to change positions.  (*Id.*).  However, he found that she could sit for only 2 hours

total in an eight hour day, and stand for less than that.  (Tr. 405).  She needed a job that would

permit her to lie down frequently and take 6-10 breaks in an eight-hour day, some of which

would last "for hours."  (*Id.*).  He found she could rarely lift less than 10 pounds, rarely twist or

stoop, occasionally climb stairs, and never crouch, squat or climb ladders.  (Tr. 405-406).  He

stated she would suffer from about four bad days a month and that she had been this way since at

least May 2000.  (Tr. 406).

### 4.    *Vocational Expert's Testimony*

VE Pauline McEachin testified that Konik's past work as a dispatcher for a trucking

company and as an administrative assistant were both sedentary with a skill level of 5.  (Tr. 62-

63).  The ALJ then asked the VE to imagine a hypothetical claimant of Konik's same age,

education and vocational background who

> could work at restricted sedentary work activities; that is the ability to lift
> 10 pounds regularly and occasionally; sit for six hours, stand for two
> hours, but would require the ability to sit and stand as needed . . . this
> individual should not climb or crawl but could perform other postural
> activities occasional[ly].   This job should not involve work around
> unprotected heights or hazards.   And the work activity should be simple,
> unskilled work.

(Tr. 63).  The ALJ then asked the VE if such a claimant could perform Konik's past work.  The

VE testified in the negative.  (*Id.*).  When asked if there were other jobs in the national economy

that such an individual could perform, the VE testified that there were, including the jobs of

surveillance system monitor (with 2,000 jobs in the region), receptionist clerk (4,600 jobs) and

information clerk (1,200 jobs).  (Tr. 64).  The ALJ then added the limitation of no ability to

engage in any postural activities.  (*Id.*).  The VE testified that this would not negatively impact

the number of these jobs available because sedentary jobs usually do not require performance of

postural activities.  (*Id.*).  The ALJ then asked about scheduled breaks, with the VE testifying a need for more than two 15-minute breaks and a half hour lunch would preclude competitive employment.  (Tr. 64-65).  Similarly, the VE testified that a need for more than one absence a month would preclude employment.  (Tr. 65).  Konik's counsel asked the VE if an ability to work for only three hours a day would preclude all work and the VE testified that it would.  (*Id.*).

## C.     Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Konik not disabled. At Step One, the ALJ recognized that Konik had engaged in work after her alleged onset date, but found that the work did not rise to the level of substantial gainful activity. (Tr. 15). At Step Two, he found the following severe conditions:  "ilioinguinal neuropathy, chronic ilioinguinal pain, migraine headaches, and depression." (*Id.*). At Step Three, the ALJ determined that none of Konik's conditions, either alone or in combination, met or medically equaled a listed impairment. (Tr. 16). In making this assessment, the ALJ noted that he evaluated Konik's impairments against Listings 1.00, 4.00 and 12.04. (*Id.*). He further found that Konik had no restriction in her activities of daily living or in her social functioning, but had moderate difficulties in concentration, persistence and pace, although noting that these were more likely due to effects of her medication rather than directly from a mental impairment. (*Id.*). Konik had no episodes of decompensation. (*Id.*).

The ALJ next assessed Konik's RFC, finding her capable of performing "sedentary work . . . except she requires the option to sit or stand. She cannot be exposed to unprotected heights and is limited to simple unskilled work." (Tr. 17). At Step Four, the ALJ found that given this RFC, Konik was unable to perform her past relevant work. (Tr. 20). At Step Five, the ALJ

16

found, with the aid of VE testimony, that there remained a significant number of other jobs in the national economy that Konik could still perform. (Tr. 21). Therefore, he concluded, she was not disabled through her date last insured. (Tr. 21).

**E.    Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.   Analysis

Konik takes issue with the ALJ's weighing of Dr. Bacheldor's opinion and his reasons for giving it the limited weight he did, and with his assessment of Konik's credibility.   For the reasons discussed below, the Court concludes that the ALJ's findings as to both issues were proper.

### 1.   The ALJ's Weighing of Dr. Bacheldor's Opinion is Supported by Substantial Evidence

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much

18

weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.* (*citing Soc. Sec. Rul.* 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5). An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F. R. § 404.1527(e)(1), (e)(3). Here, the ALJ gave Dr. Bacheldor's opinion "moderate" weight, and also stated that "any conclusion that claimant could not work, even with restrictions, is given no weight since the record as a whole does not support this." (Tr. 19). The ALJ erred in neither respect.

The ALJ found that "the record does not support Dr. Bacheldor's conclusion that the claimant could not even handle a job with light stress." (*Id.*). As reasons for this finding, the ALJ noted that although Konik had reported to Dr. Bacheldor that her injections had not relieved her pain, she had frequently reported to the pain clinic that her injections had completely relieved her pain on many occasions. (*Id.*). He also cited the State agency opinion that found that Konik could perform medium work based on the fact that her records indicated "a pattern that suggests good and bad periods regarding her pain and that she found relief through injections." (*Id.*). The ALJ noted that the State agency documented Konik's pain as between 0-3 and 7/10 "throughout the applicable years, which the State agency found to be accommodated for by the given residual functional capacity." (*Id.*). The ALJ ultimately gave little weight to the State agency conclusion

that Konik could perform medium work, but did give it some credit to the extent "[t]he record does not suggest that the claimant was in such continuous distress that she would not have been able to work with the assistance of pain relief treatment such as the type she was benefiting from." (*Id.*). He went on to find that his RFC did take into consideration some of Dr. Bacheldor's imposed limitations, including Konik's inability to lift more than 10 pounds and her need to alternate between sitting and standing. (*Id.*).

The Court finds that the ALJ gave good reasons for assessing Dr. Bacheldor's opinion only moderate weight. He discussed the fact that Konik's contemporaneous reports of pain relief from her epidural injections to the pain clinic were contrary to her later reports to Dr. Bacheldor. (Tr. 19). This reason is supported by substantial evidence of record. As discussed above, *supra* at 10-12, Konik underwent at least six injections prior to her date last insured, four of which she reported to both the pain clinic and Dr. Bacheldor as providing good or complete relief from her pain. (Tr. 229-32; 264; 266; 269; 270; 272; 278-81; 288-89). The ALJ had good reason reject Dr. Bacheldor's conclusions to the extent they were based on Konik's later reports that she had received no relief from these injections. The ALJ also appropriately noted that the medical evidence did not demonstrate significantly limited range of motion, muscle spasms/atrophy, motor weakness, sensation loss, or reflex abnormalities. (Tr. 20). *Blakely*, 581 F.3d at 406; 20 C.F.R. § 404.1527(d)(2).[4] Nevertheless, the ALJ gave Dr. Bacheldor's opinion moderate weight, and incorporated some of its findings into his RFC limitations, such as the need to lift less than 10 pounds and to alternate between sitting and standing. Thus, the Court finds that the ALJ gave good reasons for the weight given to Dr. Bacheldor's opinion, and his reasons are supported by

---

[4] Contrary to the implication in Konik's brief [10 at 16, 19-20], the Commissioner did not ignore that Dr. Bacheldor had a longstanding treatment relationship with her (Tr. 19) – he simply found that that fact was outweighed by other record evidence which called the doctor's opinions into question.

substantial evidence of record.

The ALJ's decision to give no weight to Dr. Bacheldor's opinion that Konik could perform no work was also proper, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F.R. § 404.1527(e)(1), (e)(3).

2.  *No Compelling Reasons Exists to Disturb the ALJ's Credibility Assessment*

The Court also finds that the ALJ properly assessed Konik's credibility.  The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Thus an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." to determine if the claimant's claims regarding the level of her pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Konik argues that the ALJ erred by "requir[ing] orthopedic or neurological signs in order to demonstrate the existence of [her] pain."  [10 at 18].  The Court disagrees.  The ALJ found Konik's allegations of totally disabling pain less than credible due *in part* to the lack of objective medical signs of functional limitation, *supra* at 20, and her reported daily activities, which included performing some work for her husband in 2007 and 2008 (noting that her income level during those years rose above the amount she alleged she worked during that period and also

21

noting that she "described working in the office alone handling some of the bookkeeping" before taking on a co-worker in 2009).  (Tr. 20).  He also found her less than credible due to the fact that her subjective reports "are not consistent with the objective medical evidence regarding those impairments," comparing her subjective reports of the effectiveness of her treatment to her reports to providers at the time of the same.  (*Id.*).  While it is true that the lack of objective medical signs alone cannot be a reason for rejecting a claimant's subjective complaints of pain, *see Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), it can be one of several reasons for doing so, which here also includes the fact that those subjective complaints are contradicted by the medical evidence of record regarding the effectiveness of her treatment regimen.  (Tr. 19-20); *Felisky*, 35 F.3d at 1039 (Commissioner must evaluate all relevant evidence including effectiveness of medication).  Indeed, the regulations make clear that objective medical evidence "is a useful indicator to assist [the Commissioner] in making reasonable conclusions about the intensity and persistence of your symptoms and the effect of those symptoms, such as pain."  20 C.F.R. § 404.1529(c)(2).  Finally, as discussed in detail above, *supra* at 10-12, 20, the ALJ appropriately noted inconsistencies in Konik's statements and testimony about the effect that the epidural injections had on relieving her pain, which clearly go to the issue of credibility.  (Tr. 18-19).

In sum, contrary to Konik's argument [10 at 18], the ALJ did not erroneously "require" her to substantiate her claimed level of pain through any particular objective medical evidence, but merely noted, as part of his analysis, that such evidence was lacking.  (Tr. 20).  And, he gave additional valid reasons for his overall credibility assessment.  Accordingly, the Court finds that the ALJ's credibility determination should not be disturbed.

Because the ALJ properly assessed Konik's credibility and properly weighed her treating

physician's opinion, and because the ALJ's ultimate conclusion is supported by substantial evidence of record, it should be affirmed.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Konik's Motion for Summary Judgment [10] be DENIED, the Commissioner's Motion [13] be GRANTED and this case be AFFIRMED.

Dated: January 23, 2014                                s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                   United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 23, 2014.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager